**Opinion filed August 31, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00026-CV
_____

## JOHN REAVES, Appellant

## V.

## KAREN REAVES, Appellee

**On Appeal from the 52nd District Court**

**Coryell County, Texas**

**Trial Court Cause No. CD-07-37323**

## MEMORANDUM OPINION

This is a marital property distribution case. At issue is the characterization of an annuity. The trial court entered a memorandum of decision and confirmed that the annuity was Karen Reaves's separate property. John filed a motion for reconsideration; Karen filed a motion for the trial court to sign a final divorce decree. Both motions were heard on the same day. The trial court entered a second memorandum of decision in which it declined to re-characterize the annuity and confirmed that the annuity was Karen's separate property. The court then entered a final decree of divorce. On appeal, John complains that the trial court erred when it concluded

that the annuity was Karen's separate property. He also claims that the trial court erred when it valued a vehicle that it awarded to Karen. We affirm.

I. *Background Facts*

John and Karen Reaves were married for twenty years. At the time of her marriage to John, Karen owned a Best of America America's Vision Annuity (the Vision Annuity). The annuity was funded by insurance proceeds that Karen received after the death of her previous husband. John was in active military service when he married Karen, first in the Air Force and then in the Army.

Karen suffered a debilitating back injury in June 2000, and John became the primary wage earner of the community. John was on active duty in the military, and it was his practice to leave Karen with a power of attorney when he was away on duty. In December 2002, John executed a power of attorney in which he appointed Karen as his attorney-in-fact. This power of attorney was set to expire on December 2, 2005.

As part of the course of treatment for her back injury, Karen's doctors prescribed a pain management program for her. The doctors prescribed Vicodin, Flexeril, and trazodone for pain relief; Activelle for depression; and Zyrtec, Nasonex, and Pantonol for allergy relief. However, the course of treatment was not effective. Karen did not get better and experienced difficulty when she walked.

Karen later saw another doctor, who suggested that she would benefit from a facet nerve ion injection. The treatment alleviated Karen's back pain. However, she went back to the doctor a week later with a new pain in her forearm and wrist. On July 3, 2003, the doctor increased Karen's prescription for Celebrex and refilled her prescription for Vicodin.

Karen and John met Dick Dwinell when they took a new member class taught by Dwinell at their church. In addition to his church activities, Dwinell was also a financial planner. On July 7, 2003, Karen and John met with Dwinell regarding their financial investments. Karen testified that she had not discussed transferring her annuity, nor had she spoken to Dwinell about her finances at all before she and John went to his office. Karen was presented with documents that were already filled out and ready for her signature. Karen did not know how Dwinell knew to have the transfer forms completed and ready for her signature. However, she did know that John had appointments with Dwinell outside her presence.

Dwinell's notes reflect that there were times when he spoke to John outside Karen's presence. Dwinell noted that he asked John if they were sure about transferring the couple's IRAs and brokerage accounts from Fidelity to Oppenheimer funds and that John replied, "Yes, we are"; Karen was not present. Dwinell had an asset allocation/risk tolerance worksheet on file that was filled out by John on May 23, 2003. However, there was not one for Karen even though Dwinell admitted that "[t]here should have been one with Karen's signature on it as well." Karen introduced a document entitled "investment advisory recommendations" that was prepared for Karen and John by Dwinell on June 26, 2003. The document included the recommendation that Karen's Vision Annuity be changed to the Future Annuity II. In the corner of the document, there is a handwritten notation of a call to Best of America for a change of ownership and request for a letter of instruction. Dwinell testified that that call was made to Best of America regarding a change of ownership on July 1, 2003.

One of the documents presented to Karen for signature at the July 7 meeting was for the conversion of her Vision Annuity to a new product, the Best of America America's Future Annuity II (the Future Annuity). Karen testified that Dwinell led her to believe that the change was a beneficiary change that would enable John to receive the money from the annuity faster in the event of her death. The letter of acknowledgment that Karen signed lists the benefits of the transaction as cost savings and the addition of a spousal rider. Karen testified that, when she raised concerns, Dwinell told her a story, which Dwinell called his "commingling horror story," to illustrate the consequences of the transaction in the event of a divorce. Dwinell told Karen that a judge would have to determine the outcome. But Karen testified that Dwinell eventually told her that a judge would rule in her favor because the money originated from the death of her first husband.

Karen testified that she did not understand the story that Dwinell used to explain the consequences of a divorce. However, she felt pressured, shamed, and "cajol[ed]" by Dwinell for asking about divorce, so she finally signed the papers. Karen also testified that her intention on that day was to streamline John's receipt of benefits in the event of her death, not to make a gift to John's separate property

Dwinell did not explain to Karen that she was giving John half of the annuity. Dwinell recommended the transaction for its supposed tax advantages. However, he never advised Karen and John of the potential gift tax consequences of the transaction. Dwinell testified that he did

3

not consider it a gift when spouses transferred individual accounts into a joint account. He knew that the annuity was funded with a single premium purchased by Karen before the marriage and that it was in her name, but he did not remember if he investigated whether it was her separate property. Dwinell agreed that he owed both John and Karen an equal duty to look after their best interests. However, a change in ownership was of no benefit to Karen. Every potential advantage Dwinell gave for purchasing the new product could have been accomplished without making John an owner on the account. Dwinell made a $14,522.10 commission on the transaction.

When asked what he did to make sure Karen was completely informed about the potential consequences of the transaction, Dwinell testified that he told Karen that, if there was a divorce, a judge would have to make a determination. The potential for loss was "[i]mplied," and he simply did not tell Karen that she essentially was gifting half of the account because he thought that, "if you have joint ownership, that should be understood." However, Dwinell also told Karen that she was the "lead owner" and that John was the "joint owner," but, at trial, pleaded ignorance about the legal significance of those terms. He did not explain to Karen that she would no longer have authority to make changes on the account without John's permission because "[s]he didn't ask the question about it."

Dwinell testified that he never would have recommended the change in ownership if he thought he was dealing with clients who were going to get divorced. However, during the meeting, Karen specifically asked about the consequences of a divorce. Dwinell's own notes from the meeting confirm this. Dwinell's response was to tell Karen a story about a man who willed all his belongings to his son but also remarried and changed his accounts to joint accounts with his new wife. The son was left out of the estate. This story illustrates the legal consequences of death, but not necessarily divorce. Dwinell also referred to the transaction as a "commingling" of the funds. But no funds were ever commingled.

In 2005, Karen discovered that John was moving money away from their joint accounts. She responded by using her power of attorney to execute an Owner Change Request form in which she asked to remove John as co-owner of the Future Annuity II. In January 2006, John retired from the U.S. Military, with twenty-two years and two months of service. Seventeen years and seven months of his service occurred during his marriage to Karen.

4

During the summer of 2006, John began to live and work in San Antonio; he returned home on the weekends. In December of that year, Karen found, among John's things, preliminary paperwork regarding a divorce between them. When Karen confronted him, John admitted that he was planning to file for divorce when his work contract was renewed. Karen filed her own divorce action in February 2007.

After it heard testimony and weighed the evidence, the trial court issued a memorandum of decision in which it characterized the Future Annuity II as Karen's separate property. It also listed specific findings as the basis for its decision. The trial court found that Karen's separate property solely funded the Future Annuity II, that it was not increased by any community funds, and that the current annuity was traceable to Karen's separate property. It also found that, at the time of the conversion, the annuity was the largest asset owned by either of the parties.

Additionally, the trial court found that it was not Karen's intent to make a gift of one-half of the annuity to John and that she did not understand that her actions would raise the presumption of a gift. The trial court also found that the primary discussion concerning the conversion was that it would reduce management fees and would create a spousal benefit for John. Karen's intent was to purchase an improved product. It was also significant to the trial court that there apparently was no discussion of estate planning, a common reason given for large gifts between spouses. John's and Karen's estates were not of a size to necessitate equalization of their estates for estate tax purposes.

Finally, the trial court found that John took an active role in arranging the transaction. There was substantial direct contact, discussion, and decision-making that took place between John and Dwinell regarding the annuity conversion. There was a personal relationship between the three parties through their church.

The trial court found that the totality of the circumstances suggested that Karen was not fully informed of the possible effects of the conversion of the annuity and that she relied on John and Dwinell. The circumstances, it found, "indicate a situation in which it would not be appropriate to presume or imply an actual intent to make a gift with regard to [Karen]'s primary separate property asset which was the largest asset of her estate." At no time was Karen made aware that she was making a gift of one-half of the annuity to John as his separate property. The trial court found that there was not sufficient evidence to prove that the alleged gift was made

5

knowingly, voluntarily, and fairly. The court made the specific finding that Karen's testimony and the other evidence were sufficient to rebut the presumption of a gift.

The court also valued each asset in the estate and made a division of those assets. The 2007 Honda Accord, the subject of appellant's third and fourth issues, was awarded to Karen and valued at $0.00.

## II. *Issues*

In his first two issues, John asserts that the trial court abused its discretion when it characterized the annuity as Karen's separate property because the evidence was legally and factually insufficient to rebut the presumption that she had gifted one-half of the annuity to him. In his third and fourth issues, he argues that the evidence was legally and factually insufficient to support the trial court's valuation of Karen's Honda Accord at $0.00.

## III. *Standard of Review*

Absent an abuse of discretion, the trial court's determination of the character of property and its distribution will not be disturbed on appeal. *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981); *Bigelow v. Stephens*, 286 S.W.3d 619, 620 (Tex. App.—Beaumont 2009, no pet.); *Wells v. Wells*, 251 S.W.3d 834, 838 (Tex. App.—Eastland 2008, no pet.). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Sw. Bell Tel. Co. v. Johnson*, 389 S.W.2d 645, 648 (Tex. 1965).

When an appellant challenges the trial court's order on legal or factual sufficiency grounds, we do not treat these as independent grounds of reversible error but, instead, consider them as factors relevant to our assessment of whether the trial court abused its discretion. *Wells*, 251 S.W.3d at 838 (citing *Boyd v. Boyd*, 131 S.W.3d 605, 611 (Tex. App.— Fort Worth 2004, no pet.). To determine whether the trial court abused its discretion because the evidence is legally or factually insufficient, we consider whether the court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in the application of that discretion. *Id.* (citing *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998, no pet.)).

When the burden of proof at trial is clear and convincing evidence, as when a party attempts to rebut the "community presumption," we apply a higher standard of legal and factual

sufficiency review. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). Clear and convincing evidence is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Moroch*, 174 S.W.3d at 857; *see also* TEX. FAM. CODE ANN. § 101.007 (West 2008). To meet the clear and convincing burden, the proof must "weigh more heavily than merely the greater weight of the credible evidence, but the evidence need not be unequivocal or undisputed." *Moroch*, 174 S.W.3d at 857–58.

## IV. *Presumptions*

Property possessed by either spouse during or on dissolution of the marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003(a) (West 2006). The party asserting that a certain piece of property is actually separate property must establish the separate character of the property by clear and convincing evidence. *Id.* § 3.003(b). "The statutory presumption that property possessed by either spouse upon dissolution of the marriage is community is a rebuttable presumption and is overcome by evidence that a specified item of property is the separate property of one spouse or the other." *Moroch*, 174 S.W.3d at 856. To satisfy this burden, the spouse must trace "the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Moroch*, 174 S.W.3d at 856–57; *see also Cockerham v. Cockerham*, 527 S.W.2d 162, 167 (Tex. 1975).

Property of a spouse owned before marriage, and that acquired afterward by gift, devise or descent, is the separate property of that spouse. TEX. CONST. art. XVI, § 15; *see also* TEX. FAM. CODE ANN. § 3.001(2) (West 2006) (defining separate property as including property "acquired by the spouse during marriage by gift"). Property purchased during the marriage with monies that can be traced to a spouse's separate estate is characterized as separate property. *Pace v. Pace*, 160 S.W.3d 706, 711 (Tex. App.—Dallas 2005, pet. denied).

A second presumption arises when, as here, a spouse uses separate funds to purchase property during marriage and takes title to the property in joint names. In that event, there is a presumption that a gift was intended. *Harrison v. Harrison*, 321 S.W.3d 899, 902 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing *Cockerham*, 527 S.W.2d at 168). This presumption, however, can be rebutted by evidence that establishes there was no intent to make a gift. *Id.* A rebuttable presumption shifts the burden to produce evidence to the party against whom it

7

operates. *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993). Once the burden is discharged and evidence contradicting the presumption has been offered, the presumption disappears and is not weighed or treated as evidence. *Id.*

V. *Analysis*

### A. *Karen's Separate Property*

John argues that the trial court abused its discretion when it characterized the annuity as Karen's separate property because the evidence was legally and factually insufficient to rebut the presumption that she had gifted one-half of the annuity to him. Karen argues that the burden to prove donative intent shifted back to John when she rebutted the presumption of an interspousal gift. Both parties agreed that the annuity could be traced to Karen's separate property prior to the marriage. They also agreed that no community funds were ever added to the annuity. The issue, therefore, does not concern tracing but, rather, whether Karen had the donative intent necessary to make a gift to John.

Appellant argues that, because the instrument of conveyance contained a "separate property recital," the trial court should not have allowed parol evidence to rebut the presumption of gift. He cites *Roberts v. Roberts* for this proposition. *Roberts v. Roberts*, 999 S.W.2d 424, 432 (Tex. App.—El Paso 1999, no pet.). John points to part of the letter of acknowledgment of the Future Annuity II that Karen signed that contains a statement that she "ordered the liquidation and transfer [of an] investment [she] currently own[s]." This, he says, is a "separate property recital" because it states that the consideration for the Future Annuity II was Karen's separate property. He also cites the prospectus for the Future Annuity II because it states that "[j]oint owners each own an undivided interest in the contract."

In *Roberts*, as in most, if not all, other cases that deal with "separate property recitals," land was the property at issue and the instrument of conveyance was a deed. In addition, the cases cited in *Roberts* dealt with transactions whereby a wife received a deed that contained a recital that certain realty was to be her separate property *and* that it was paid for from her separate estate. *Henry S. Miller Co. v. Evans*, 452 S.W.2d 426, 430–31 (Tex. 1970); *Messer v. Johnson*, 422 S.W.2d 908, 912 (Tex. 1968). Additionally, the "separate property recitals" in these types of cases involve the use of specific terminology. "The cases which hold that parol evidence is not admissible to contradict the express recitals in a deed, involve deeds which expressly state that property is conveyed to grantees as their *separate property* or for their

8

*separate use.*" *Bahr v. Kohr*, 980 S.W.2d 723, 727 (Tex. App.—San Antonio 1998, no pet.). The decision to exclude parol evidence rests "not upon a recital of contractual consideration, but upon the fact that the instrument stipulated, in effect, that the beneficial ownership of the property was conveyed to the [spouse] for [his or her] separate use." *Jackson v. Hernandez*, 285 S.W.2d 184, 186 (Tex. 1955).

This case is distinguishable from *Roberts* in that it does not involve a deed. The recitals to which John refers in this case do not state that John purchased his interest in the annuity with his own separate property. Also, the recitals are not that the property will be John's "separate" or "sole and separate" property or for his "separate use." The words "separate property" or "separate use" are never used in the contract, letter of acknowledgment, or prospectus. Though the contract uses the term "joint owner," which is defined in the prospectus as giving joint owners "an undivided interest in the contract," nothing in the documents indicates that there has been a conveyance from Karen to John or that any sort of transfer in beneficial ownership has occurred. The trial court found that Karen relied upon Dwinell's advice in the transaction, but when asked about the meaning of "undivided interest," Dwinell testified, "You're going way back in my memory banks" and "That's a legal term and I'm sorry." Because the contract does not expressly recite the character and use of the property, we find that the parol evidence rule does not prevent introduction of evidence to rebut the presumption of a gift.

Karen testified that she did not intend to make a gift to John and that the only purpose of the transaction was to streamline John's receipt of benefits in the event of her death. Dwinell's handwriting on the "Variable Annuity/Variable Life Letter of Acknowledgement" seems to corroborate Karen's testimony. He listed the savings in annual charges and the spousal rider feature as the benefits of the transaction. We conclude that Karen rebutted the presumption when she testified that she did not intend to make a gift and when she provided an alternative reason for the transaction. *See Harrison*, 321 S.W.3d at 902. Because Karen discharged her burden and offered evidence that contradicted the presumption, the presumption disappears and is not weighed or treated as evidence. *Id.* The evidence is then evaluated as in any other case, and the presumption has no effect on the burden of persuasion. *Id.*

Thus, the burden was placed back on John. Generally speaking, one who is claiming the existence of a gift has the burden of proof on that issue. The burden to prove a gift is on the party who claims it. *Powell v. Powell*, 822 S.W.2d 181, 183 (Tex. App.—Houston [1st Dist.]

1991, writ denied). A gift is a "voluntary transfer of property to another made gratuitously and without consideration." *Wells*, 251 S.W.3d at 839 (citing *Hilley v. Hilley*, 342 S.W.2d 565, 569 (Tex. 1961)). To establish the existence of a gift, the party must prove three elements: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Id.* (citing *Long v. Long*, 234 S.W.3d 34, 40 (Tex. App.—El Paso 2007, pet. denied)). A party establishes the requisite donative intent by, among other things, presenting "evidence that the donor intended an *immediate and unconditional* divestiture of his or her ownership interests and an immediate and unconditional vesting of such interests in the donee." *Nipp v. Broumley*, 285 S.W.3d 552, 559 (Tex. App.—Waco 2009, no pet.).

Even when applying a higher standard of legal and factual sufficiency review, there is ample evidence in the record to support the trial court's findings that Karen did not intend to give one-half of the annuity to John as a gift. Because of her medical condition, Karen relied upon John to read the documents and tell her of any major changes. John, Karen, and Dwinell each testified that no one ever told Karen that she was giving John anything. The words "gift" or "give" were never used, and the fact that the transaction would give half of the account to John was not discussed by anyone. The testimony at the hearing made clear that Karen was ill-advised by Dwinell about the consequences of the transaction. We cannot say that the trial court abused its discretion. There was clear and convincing evidence of a lack of donative intent on Karen's part. We overrule appellant's first and second issues.

### B. Valuation of the Honda Accord

The trial court awarded Karen a 2007 Honda Accord. In his third and fourth issues, John argues that the evidence is legally and factually insufficient to support the trial court's ruling by which it assessed the value of the Honda Accord. The trial court valued the car, less the debt secured against it, at $0.00. John filed a motion for reconsideration in which he asked the trial court to revalue the car at $3,389.

Karen testified that the balance due on the car loan was $10,723.65. She introduced into evidence a statement from her credit union from June 27, 2008, several days prior to the hearing, showing an auto loan balance in the amount of $10,723.65. John testified that the loan amount was $11,800 and that the vehicle was worth $16,175. This was all of the evidence before the court as to the value of the vehicle and the debt secured by it.

10

However, the court also had in its files inventories from both parties that were filed after the trial hearing. According to John's First Amended Inventory and Appraisement, the vehicle had a value of $11,925. He attached to his inventory an estimate from the Kelley Blue Book website that gave a range of trade-in value estimates for the vehicle. The values were listed as $11,925 for a vehicle in excellent condition, $11,125 for a vehicle in good condition, and $9,850 for a vehicle in fair condition. The Kelley Blue Book valuations assume "an accurate appraisal of condition." Karen stated in her first amended inventory that the 2007 Honda Accord had no community value.

Generally, unless a party's inventory is admitted into evidence, that party may not rely on the inventory as evidence on appeal. *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 509 (Tex. App.—Austin 1994, no writ). However, in *Vannerson v. Vannerson*, the court concluded that, because sworn inventories are filed with the trial court and because the court may take judicial notice of its own papers, a trial judge may rely on information gleaned from sworn inventories even if such documents have not been formally introduced into evidence. *Vannerson v. Vannerson*, 857 S.W.2d 659, 671 (Tex. App.—Houston [1st Dist.] 1993, writ denied). In *Bradford v. Bradford*, the court held that the appellant was estopped to complain that documents were not admitted in evidence and so could not be considered on appeal when the trial court and parties treated the documents as if they were in evidence and the appellant voiced no objection below. *Bradford v. Bradford*, No. 14-94-00881-CV, 1995 WL 613060, at *2 (Tex. App.—Houston [14th Dist.] Oct. 19, 1995, no writ) (not designated for publication).

In this case, the inventories were not formally introduced into evidence. They were filed after the final hearing, but prior to the trial court's memorandum of decision. John never objected to the trial court's use of the inventories as evidence below and does not make that argument on appeal. The issue was not mentioned in appellant's motion for reconsideration or during the trial court's hearing on the motion, even though the trial court stated, "[T]he parties did file amended inventories that were accepted by the Court in June of '09. And I understood that to be in addition to what evidence had been presented previously." We do not think that, in this instance, the trial court erred by relying upon information that it gleaned from the inventories. However, even if the trial court had erred, John has waived the issue.

The trial court, as the factfinder, is "entitled to consider the weight and credibility of the testimony and other evidence submitted in making its determination as to the valuations to be

assigned to the various items of property." *In re Marriage of Jackson*, 506 S.W.2d 261, 266 (Tex. Civ. App.—Amarillo 1974, writ dism'd). When a trial court is asked to choose between different values, it has broad discretion in determining what values to assign. *See Williams v. Clark*, No. 03-03-00585-CV, 2004 WL 1171704, at *4 (Tex. App.—Austin May 27, 2004, no pet.) (mem. op.) ("faced with two conflicting versions of the value of a piece of the couple's property," the trial court did not abuse its discretion in choosing to believe one party over the other).

Karen and John gave roughly the same answer when asked about the debt secured by the vehicle. However, the trial court was given a range of potential values that depended upon the condition of the vehicle. The court was given no evidence about the vehicle's condition, other than the fact that John assigned it a value that corresponds with the Kelley Blue Book's "excellent" category. But, by all accounts, the value of the vehicle was very close to the balance due on the loan. The trial court had broad discretion and was not without sufficient basis for its decision. The trial court did not abuse its discretion by assigning the vehicle a net value of $0.00. John's third and fourth issues are overruled.

The judgment of the trial court is affirmed.

PER CURIAM

August 31, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

12